UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
AT&T CORP.,

                    Plaintiff,              **MEMORANDUM AND ORDER**

          - against -                        12 Civ. 1812 (NRB)

SYNIVERSE TECHNOLOGIES, INC.,

                    Defendant.
---------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## I.   Introduction

     On March 12, 2012, plaintiff AT&T Corp. ("AT&T") brought
this action against defendant Syniverse Technologies, Inc.
("Syniverse") asserting claims for breach of contract, unjust
enrichment, and quantum meruit.   Specifically, AT&T seeks to
collect $1,445,761.44 in charges allegedly owed under a contract
with Syniverse, plus monthly service and other charges in the
amount of $92,489.36.   Presently before the Court is Syniverse's
motion for summary judgment.   Oral argument was held on the
motion on August 21, 2014.[1]   For the reasons set forth below, we
deny the motion for summary judgment.

---
[1] References preceded by "Tr." refer to the transcript of oral argument.

## II.  Background[2]

The following facts are undisputed except where otherwise noted.

### A. The Master Carrier Agreement

In 2002, Syniverse and AT&T entered into a contract known as the Master Carrier Agreement ("MCA") pursuant to which AT&T agreed to provide telecommunications services to Syniverse. Def. R. 56.1 ¶ 1.  The MCA did not identify the particular services that AT&T would provide to Syniverse, but instead expressed the parties' understanding that, as the need for services arose, they would enter into attachments to the MCA that would describe the services being ordered.  Id. ¶ 4.  AT&T and Syniverse entered into two attachments that are relevant to the current litigation: the first was executed in October 2007 (the "2007 Attachment"), and the second was executed in February 2009 (the "2009 Attachment").  Both were drafted by AT&T and incorporated into the MCA.  Def. R. 56.1 ¶¶ 7, 8, 14.

---

[2] The facts recited here are drawn from the following sources: (1) Defendant's Statement of Uncontested Facts Pursuant to Rule 56.1 ("Def. R. 56.1"); (2) the Declaration of Joshua Sivin in Support of Defendant's Motion for Summary Judgment ("Sivin Decl."), and the exhibits annexed thereto; (3) Defendant's Memorandum of Law in Support of its Motion for Summary Judgment Dismissing the Complaint ("Def. Br."); (4) Plaintiff's Response to Defendant's Rule 56.1 Statement ("Pl. R. 56.1"); (5) the Declaration of Bethany A. Johnson in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Johnson Decl."), and the exhibits annexed thereto; (6) the Affidavit of Jerry Gilmore in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Gilmore Aff."); and (7) Plaintiff's Memorandum of Law in Support of its Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp.").

**B.  The 2007 Attachment**

The 2007 Attachment required Syniverse to order a certain volume of AT&T data services on an annual basis -- what the Attachment referred to as a minimum annual revenue commitment, or "MARC" -- for each year in a four-year period, with the first year running from May 2006 through April 2007 (before the Attachment was even executed), and the fourth year (the "Disputed Period") running from May 2009 through April 2010. Def. R. 56.1 ¶ 9.  The MARC was $4,700,000 for the first year and $3,545,000 for the next three years.[3]  Sivin Decl. Ex. 6 ¶ 3.A.1.  MARC-eligible charges "consist[ed] of the net Monthly Recurring Charges, after the application of any discounts or credits, for Private Line Services, APLS OC-48 IOC Service, Local Channel Services, International Satellite Services, and AT&T Domestic Frame Relay Service provided under this Attachment," as well as other services not at issue in this case.  Id. ¶ 3.A.2.  If Syniverse missed the MARC in any given year, the Attachment required Syniverse to pay the shortfall to AT&T.  Id. ¶ 3.

A central issue in this case is which services were in fact MARC-eligible under the terms of the 2007 Attachment.  Although

---

[3] AT&T witnesses explained that the $4,700,000 MARC for the first year was based on gross spend -- meaning it did "not inclu[de] . . . any credits or adjustments to the bill" (Sivin Decl. Ex. 1 at 66) -- whereas the $3,545,000 MARC for the last three years was based on net spend.  Pl. R. 56.1 ¶ 19; Gilmore Aff. ¶¶ 4, 5.

the parties agree that "Local Channel Services" counted towards the MARC, they disagree on what that term encompassed. Syniverse contends that it included "switched access" and "special access" services on which Syniverse spent approximately $2.3 million during the Disputed Period.[4]  Def. Br. at 8.  These services were related to the local channel (a circuit which connects AT&T customers to a facility known as a point of presence), and therefore could be described as local channel services.  Syniverse's interpretation is bolstered by: (1) the testimony of Jeff Gorbach, an AT&T employee who stated that switched access and special access services could, broadly speaking, be considered local channel services (Sivin Decl. Ex. 12 at 89); (2) the testimony of Kim Reid, an AT&T employee who stated that special access services could be MARC-eligible, and that at least one of the services listed in the 2007 Attachment was in fact a type of special access service (Sivin Decl. Ex. 1 at 84, 110-12); (3) the fact that Syniverse's 2006 spend on special access services was used to help set the MARC (Gilmore Aff. ¶ 11; Johnson Decl. Ex. C at 183, 222-23); and (4) the fact that for the first three years of the 2007 Attachment, AT&T had credited special access services -- though not switched access services -- against the MARC, and had determined that the MARC

---

[4] Syniverse spent approximately $1.7 million on switched access services and $600,000 on special access services.  Def. Br. at 8.

had been met (Gilmore Aff. ¶ 11; Johnson Decl. Ex. C at 132, 143).[5]

AT&T, on the other hand, argues that the term "Local Channel Services" had a more specific meaning because it was modified by the phrase "provided under this Attachment." Sivin Decl. Ex. 6 ¶ (3)(A)(2). Indeed, two witnesses testified that a service could be a local channel service yet not MARC-eligible under the 2007 Attachment. Sivin Decl. Ex. 1 at 189, Ex. 12 at 89. AT&T points to several pieces of evidence that support its position that switched access and special access services were not "Local Channel Services . . . provided under [the 2007] Attachment."

First, AT&T notes that switched access and special access services were purchased by Syniverse directly through affiliated Local Exchange Carriers ("LECs") -- rather than through AT&T -- pursuant to tariffs not provided under the 2007 Attachment and via separate ordering systems that predated AT&T's affiliation with the LECs. Pl. R. 56.1 ¶ 22-24; Johnson Decl. Ex. C at 71, 101. Notably, the 2007 Attachment had its own unique Master Customer Number ("MCN") under which services could be ordered and billed. Switched access and special access services were

---

[5] Syniverse also suggests that AT&T had an incentive to claim a shortfall, even if there was none, in order to extract more business from Syniverse on favorable terms. Although there is no evidence that AT&T lied about the shortfall, an AT&T witness did confirm that she would use a shortfall for leverage when negotiating a new deal with Syniverse. Sivin Decl. Ex. 1 at 141-42.

not ordered or billed under this MCN because Syniverse purchased them directly through the AT&T-affiliated LECs.  Pl. Opp. at 15, 17-18; Tr. 20, 49-50.

Jerry Gilmore, the Sales Director of AT&T who helped negotiate the 2007 Attachment, testified that the term "Local Channel Services" referred only to those services provided by AT&T -- not LECs -- for the purpose of connecting a customer to a long distance network, and that switched access and special access services did not meet this definition.  Johnson Decl. Ex. C at 71-72, 90, 103-04, 123.  Kim Reid, another AT&T employee, supported this testimony in part, stating that switched access services were not provided under the 2007 Attachment.  Sivin Decl. Ex. 1 at 112, 114-15.

Second, the switched access and special access services Syniverse purchased were not specifically identified in the 2007 Attachment.  Pl. Opp. at 14.  Paragraphs 4.A.11 and 4.A.12 of the Attachment listed customized pricing for a number of services that were labeled "Local Channel Services."  Although these services were not an exhaustive list of "Local Channel Services" -- a point which AT&T conceded at oral argument (Tr. 59-60) even though it took the opposite position in its briefing papers (Pl. Opp. at 2, 14, 22)[6] -- it is noteworthy that they

---

[6] Significantly, there is no testimony or document in the record indicating that paragraphs 4.A.11 or 4.A.12 of the 2007 Attachment represented a comprehensive list of the MARC-eligible "Local Channel Services."

were not among the switched access and special access services purchased by Syniverse.

Finally, prior to executing the 2007 Attachment, the parties looked at Syniverse's 2006 spend on services covered under the Attachment (the "Run Rate") in order to determine where the MARC should be set. Johnson Decl. Ex. H at 22; Gilmore Aff. ¶ 11; Pl. Opp. at 19. The Run Rate was determined to be somewhere between $2,900,000 and $3,345,000. Johnson Decl. Ex. C at 88, Ex. H at 20-24, Ex. I. AT&T then increased that number by a certain amount to arrive at the MARC. Johnson Decl. Ex. C at 88, Ex. I. AT&T alleges that, had switched access services (on which Syniverse spent approximately $5 million in 2006) been contemplated as MARC-eligible, the Run Rate would have been significantly higher, and AT&T would then have set a MARC in the range of $5-6 million instead of the $3,545,000 per year agreed upon for the final three years. Pl. Opp. at 20. Indeed, Gilmore testified that switched access services were intentionally excluded from the Run Rate.[7] Johnson Decl. Ex. C at 89-90. This testimony is supported by an August 2007 email from Syniverse's Senior Contracts Manager, Cena Paxton, in which she wrote that, when calculating the Run Rate, Syniverse "would exclude all pass through spend or any related

---

[7] However, in his affidavit to the Court, Gilmore stated that certain special access services had been included in the Run Rate. Gilmore Aff. ¶ 11.

to SBC which we made." Johnson Decl. Ex. I. AT&T contends that "pass through spend" and "spend . . . related to SBC" refer to purchases of switched access services, for which payments were "passed through" to the LECs, such as SBC, that provided them. Pl. Opp. at 20.

### C. The 2009 Attachment

In May 2009, as the final year of the 2007 Attachment was about to begin, AT&T and Syniverse entered into a new attachment. Under this 2009 Attachment, AT&T agreed to provide certain services to Syniverse for a three-year period, with the first year running during the final year of the 2007 Attachment -- from May 2009 through April 2010, i.e., the Disputed Period. Def. R. 56.1 ¶ 15. The 2009 Attachment contained no mention of a MARC; however, it stated that the minimum monthly revenue commitment -- or "MMRC" -- was $0. Sivin Decl. Ex. 7 ¶ 3.1. Syniverse contends that because the 2009 Attachment was entered into after the 2007 Attachment and covered the same subject matter, it superseded the 2007 Attachment and thus eliminated the MARC for the Disputed Period. Def. R. 56.1 ¶ 16; Def. Br. at 9.

AT&T counters that while the 2007 and 2009 Attachments overlapped in some respects, there were several services that Syniverse could order pursuant to one attachment, but not the other, and that the pricing in the two attachments differed.

Pl. R. 56.1 ¶ 16.  AT&T maintains that, given the differences in services that were available under each attachment, the 2009 Attachment did not replace the 2007 Attachment, but simply gave Syniverse additional service and pricing options.  Id. ¶¶ 15, 16.  Gilmore, who participated in the negotiation of the 2009 Attachment, testified to that effect.  Johnson Decl. Ex. C at 59-60, 114, 123-24.

The language and structure of the MCA appear to support AT&T's position that the two attachments coexisted.  The MCA specified that the "Agreement consists of this Cover Sheet and the documents listed in the Table of Contents below."  Sivin Decl. Ex. 5.  Notably, both the 2007 and 2009 Attachments were included in the MCA's Table of Contents, which was amended and signed by both parties in 2009.  Id.  In contrast, earlier attachments that were no longer operative had been removed from the MCA when it was amended.  Compare Johnson Decl. Exs. D and E with Sivin Decl. Ex. 5.

With respect to the MARC, AT&T alleges that, since the 2009 Attachment did not replace the 2007 Attachment, it is immaterial that the 2009 Attachment failed to include a MARC because the MARC from the 2007 Attachment continued to govern during the Disputed Period.  AT&T argues that the two attachments were not inconsistent because the first included a MARC while the second was silent on the issue (it included only a MMRC).  Tr. 17-18.

AT&T further argues that, from a business standpoint, it would have been illogical for AT&T to forgive a commitment worth over $3.5 million without any consideration -- except, arguably, for higher prices on certain services in the 2009 Attachment -- and if AT&T in fact did so, there would likely be evidence to support that conclusion. Pl. Opp. at 12. Syniverse has not presented any evidence showing that AT&T agreed to absolve Syniverse of its MARC commitment during the Disputed Period, or that any discussion about that issue took place between the parties. Furthermore, Syniverse has not produced any evidence that either party analyzed the financial impact of discarding a multi-million dollar MARC in exchange for higher service prices. Tr. at 9.

### D. Syniverse's MARC Performance

During the first three years the 2007 Attachment was in effect, AT&T monitored Syniverse's performance and determined that it had satisfied the MARC. Def. R. 56.1 ¶¶ 18, 19. Thus, Syniverse was never billed for a shortfall during those three years. However, in August 2009, AT&T discovered that it had been counting special access services towards the MARC which, according to it, were not in fact MARC-eligible. Pl. R. 56.1 ¶¶ 19, 25; Gilmore Aff. ¶ 11. That same month, after noticing this and certain other errors, AT&T informed Syniverse that it was on track to fall short of the $3,545,000 MARC for the fourth year

of the 2007 Attachment.  Johnson Decl. Ex. C at 128; Gilmore Aff. ¶ 11; Sivin Decl. Ex. 8.  In January 2010, AT&T informed Syniverse for the first time that special access services, which AT&T had previously been counting against the MARC, were not MARC-eligible.  Johnson Decl. Ex. C at 102-03; Sivin Decl. Ex. 10.  At the end of the Disputed Period, AT&T calculated Syniverse's shortfall at approximately $1.4 million.  Pl. R. 56.1 ¶ 21.  As discussed above, AT&T excluded from its MARC calculation the approximately $1.7 million and $600,000 Syniverse spent on switched access and special access services, respectively.  Id. ¶ 24.  AT&T also deducted credits it extended to Syniverse in the Disputed Period that pertained to prior years' services.[8]  Pl. R. 56.1 ¶ 26.

On March 12, 2012, AT&T brought this action against Syniverse to recover the claimed $1.4 million shortfall.  In order for AT&T to prevail and recover the entire amount, it must ultimately establish (1) that the MARC was in effect during the Disputed Period, and (2) that the switched access and special access services were properly excluded, and the credits pertaining to prior years' services were properly deducted.  In Syniverse's summary judgment motion, it argues that AT&T has not raised a triable issue of fact with respect to either prong.

---

[8] The record does not reveal the value of these credits.  Tr. 61.

## III. Discussion

### A. Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). "In assessing the record to determine whether there is [such] a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of

material fact." Id. (citing Anderson, 477 U.S. at 249).  The

non-moving party "must do more than simply show that there is

some metaphysical doubt as to the material facts . . . and may

not rely on conclusory allegations or unsubstantiated

speculation."  Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d

Cir. 2011) (internal quotation marks and citations omitted).

**B. There is a Genuine Issue of Fact Regarding Whether the MARC was in Effect during the Disputed Period**

Syniverse contends that the 2009 Attachment, which imposed

no MARC, nullified the MARC imposed by the 2007 Attachment in

the Disputed Period.  As an initial matter, there is ample

evidence that the parties intended for the two attachments to

coexist, most notably the fact that when they amended the MCA in

2009, they listed both attachments in the Table of Contents.

See Sivin Decl. Ex. 5 ("This Agreement consists of this Cover

Sheet and the documents listed in the Table of Contents below

(each, an 'Attachment').").  Although the 2009 Attachment would

supersede any inconsistent provision in the 2007 Attachment,

Ottawa Office Integration, Inc. v. FTF Bus. Sys., 132 F. Supp.

2d 215, 219 (S.D.N.Y. 2001) ("it is a well settled principle of

law that the later contract supersedes the former contract as to

inconsistent provisions" (internal quotation marks omitted)),

the two attachments were not necessarily inconsistent with

respect to the MARC.  Indeed, the 2009 Attachment was silent on

the issue of a MARC.  The only revenue commitment mentioned was
a minimum monthly revenue commitment, which was $0.  However,
there is nothing inherently contradictory about having a minimum
annual revenue commitment of $3,545,00 and a minimum monthly
revenue commitment of $0.  Such an arrangement would merely
require Syniverse to order at least $3,545,000 worth of services
during the year while allowing it total flexibility on when it
could order those services.  Moreover, had the parties intended
to absolve Syniverse of its substantial annual revenue
commitment, there would likely be testimonial or documentary
evidence of such an agreement beyond the fact that prices for
certain services were higher in the 2009 Attachment.  The lack
of such evidence here is telling.

Therefore, we cannot conclude based on the record that the
MARC imposed by the 2007 Attachment was nullified by the 2009
Attachment.  Because AT&T has repeatedly disclaimed an intent to
cross-move for summary judgment, we do not consider whether it
could have been awarded summary judgment on this issue.

## C. There is a Genuine Issue of Fact Regarding Whether Syniverse Met the MARC

AT&T acknowledges that if the approximately $1.7 million of
switched access services and $600,000 of special access services
had not been excluded from its MARC performance calculation,
there would have been no shortfall in the Disputed Period.

14

Syniverse argues that these services should not have been excluded because they were "Local Channel Services" and thus MARC-eligible.   To resolve this dispute, we must apply principles of New York contract law, which governs the MCA.   See Sivin Decl. Ex. 13 ¶ 33.

"The initial question for the court on a motion for summary judgment with respect to a contract claim is whether the contract is unambiguous with respect to the question disputed by the parties."   Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010) (internal quotation marks and alterations omitted).   Ambiguity exists only if a contract term "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."   Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011).   "Where contractual language is ambiguous, a court may consider extrinsic evidence of the parties' intent."   Barclays Capital, Inc. v. Giddens (In re Lehman Bros. Holdings Inc.), 2014 U.S. App. LEXIS 15009, at *12 (2d Cir. Aug. 5, 2014).

The MCA does not define "Local Channel Services."   Nor does it reveal whether that term included switched access or special access services.   And "Local Channel Services" has no universally recognized meaning in the telecommunications

industry.[9]   Johnson Decl. Ex. C at 184.   Therefore, in order to determine what the parties meant by the term -- and whether they intended it to encompass switched access and special access services -- we are left to consider extrinsic evidence.   Because the evidence is substantially different with respect to switched access and special access services, we address them separately below.

### i.   Switched Access Services

AT&T has offered several reasons to conclude that switched access services were not MARC-eligible, including that: both Gilmore (who helped negotiate the 2007 Attachment) and Reid testified that these services were not MARC-eligible, and no other witness testified to the contrary; these services were excluded from the Run Rate and never counted against the MARC; Syniverse did not order them under the MCN for the 2007 Attachment; they were not among the services listed in paragraphs 4.A.11 and 4.A.12 of the 2007 Attachment; and they were purchased directly through LECs pursuant to tariffs not referenced in the 2007 Attachment.   When viewed in the light most favorable to AT&T, this evidence raises material issues of

---

[9] Gilmore, an AT&T employee, defined a "Local Channel Service" as "an AT&T-provided . . . service" -- rather than a "LEC-provided service" -- "that provides a connection from an end user location to an AT&T long distance network."   Johnson Decl. Ex. C at 103, 123.   Reid, another AT&T employee, defined it as "the long distance circuit that connects the customer to the AT&T point of presence."   Sivin Decl. Ex 1 at 58.   However, the record does not reveal which, if either, of these definitions is correct.

fact regarding whether switched access services were properly excluded from AT&T's calculation of Syniverse's MARC performance.

### ii. Special Access Services

The analysis is different with respect to special access services in three important ways. First, Syniverse's 2006 spend on special access services was included in the Run Rate, which the parties used to identify MARC-eligible services and set the MARC. Second, special access services were deemed to be MARC-eligible by AT&T during the first three years of the 2007 Attachment. Finally, two AT&T witnesses testified that special access services could be described as local channel services, and one even testified that one of the services listed in paragraph 4.A.11 of the 2007 Attachment was a type of special access service. <u>See</u> Sivin Decl. Ex. 1 at 84, 109-12, Ex. 12 at 89. Therefore, Syniverse could reasonably believe -- because it was led to believe -- that special access services were "Local Channel Services" for purposes of the 2007 Attachment.[10]  When AT&T first notified Syniverse in August 2009, approximately three months into the Disputed Period, that it was not on track to meet the MARC (Johnson Decl. Ex. C at 128; Sivin Decl. Ex. 8), it failed to mention that it was no longer counting special

---

[10] AT&T acknowledges that "there is some question as to the parties' original intent with respect to the Special Access Services." Pl. Opp. at 2.

access services towards the MARC -- a disclosure it did not make until five months later, in January 2010 (Johnson Decl. Ex. C at 102-03; Sivin Decl. Ex. 10).

These facts are critical to the contract analysis in two ways.  First, they establish the "parties' interpretation of the contract in practice," which is "compelling evidence of the[ir] intent."  W. Alton Jones Found. v. Chevron U.S.A., 97 F.3d 29, 33 (2d Cir. 1996) (internal quotation marks omitted); see also Restatement (Second) of Contracts § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").  Indeed, when calculating the Run Rate, the parties used Syniverse's past spend on MARC-eligible services.  Johnson Decl. Ex. H at 22; Pl. Opp. at 19.  Their inclusion of special access services in that calculation and in Syniverse's MARC performance for the first three years demonstrates an intent to count these services as MARC-eligible "Local Channel Services."[11]    Against this compelling evidence, and the testimony from two AT&T witnesses that special access services could be described as local channel services, the evidence in AT&T's favor -- that the services were

---

[11] In February 2010, AT&T proposed a revision to the 2007 Attachment which would have explicitly provided that special access services were MARC-eligible.  Johnson Decl. Ex. J; Pl. Opp. at 23.  This proposed revision was never executed.  Id.  AT&T cannot rely on revised language that AT&T itself proposed to show that special access services were not originally MARC-eligible.  Moreover, AT&T offers no context to the proposed revision, i.e., why the revision was proposed and why it was not executed.  Without such context, the proposed revision indicates nothing about the parties' initial intent regarding whether special access services were MARC-eligible.

not MARC-eligible because they were ordered through LECs pursuant to tariffs -- fails to raise a triable issue of fact.

Second, the facts above highlight two equitable concerns which estop AT&T from excluding special access services from the MARC calculation. The first is that Syniverse relied to its detriment on AT&T's past practice of counting these services as MARC-eligible. Tr. 38-39. Up until January 2010, AT&T led Syniverse to believe that its purchases of special access services would count towards the MARC. By the time Syniverse was told otherwise, it had only three or four months left on the contract to purchase enough MARC-eligible services to make up for the sudden shortfall. Syniverse maintains that had it known at the beginning of the Disputed Period that special access services would not count towards the MARC, it could have planned its purchases accordingly to avoid such a shortfall. AT&T has not disputed this. Thus, AT&T's delay in notifying Syniverse that special access services were not MARC-eligible after Syniverse had reasonably and detrimentally relied on AT&T's implicit representations to the contrary renders recovery for any shortfall related to these services inequitable. See In re St. Johnsbury Trucking Co., 185 B.R. 687, 690 (S.D.N.Y. 1995) (holding that "delay coupled with detrimental reliance by the party against whom the relief is sought may render the relief inequitable"); K. Bell & Assocs. v. Lloyd's Underwriters, 827 F.

19

Supp. 985, 989 (S.D.N.Y. 1993) ("[E]quitable estoppel prevents a party from enforcing or asserting rights where its own conduct has induced another to justifiably and detrimentally rely upon the belief that such enforcement would not be sought.").

Furthermore, it is unfair for AT&T to exclude purchases of special access services from its MARC performance calculation after it had used such purchases to set the MARC in the first place.  Inflating the MARC with past purchases of services that it did not intend to count towards the MARC is akin to moving the goalposts, and such inequitable conduct further counsels against a finding for AT&T.

Thus, as a matter of both contract interpretation and equity, we find that special access services qualify as MARC-eligible "Local Channel Services."

### iii. Deducted Credits

Finally, with respect to the credits AT&T deducted in the Disputed Period, we agree with Syniverse that this violated the terms of the 2007 Attachment.  Paragraph 15 of the Attachment clearly stated that the only credit that could be applied against the MARC was a one-time credit of $300,000 to be issued in the second year of the Attachment.  Sivin Decl. Ex. 6 ¶ 15. Thus, AT&T's attempt to apply credits in the fourth year --- the Disputed Period -- is prohibited.

Perhaps recognizing the futility of contesting this issue, AT&T did not even discuss it in its opposition brief.  AT&T's silence concedes the point.  See Western Bulk Carriers KS v. Centauri Shipping Ltd., No. 11 Civ. 5952 (RJS), 2013 U.S. Dist. LEXIS 49808, at *9 (S.D.N.Y. Mar. 11, 2013) (holding that plaintiff conceded argument by failing to address it in opposition brief); In re UBS AG Secs. Litig., Master File No. 07 Civ. 11225 (RJS), 2012 U.S. Dist. LEXIS 141449, at *34 (S.D.N.Y. Sept. 28, 2012) (recognizing that a party "concedes through silence" arguments by its opponent that it fails to address).

## Conclusion

In conclusion, we hold that AT&T must subtract from its claimed shortfall the special access services purchased by Syniverse during the Disputed Period as well as the credits improperly extended during that period.  Although the record indicates that Syniverse purchased approximately $600,000 worth of special access services, it does not indicate the value of the deducted credits.  Therefore, we cannot conclude that the special access services and deducted credits together exceed the $1.4 million claimed shortfall.  Consequently, because on the record AT&T can still claim a shortfall -- albeit one substantially less than the amount claimed in the complaint -- we deny Syniverse's motion for summary judgment dismissing the complaint in its entirety.

Dated:     New York, New York
           September 8, 2014

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on
this date to the following:

Attorneys for Plaintiff:

Paul R. Franke, III, Esq.
Bethany A. Johnson, Esq.
Moye White LLP
16 Market Square
1400 16th Street, 6th Floor
Denver, CO 80202

Joseph S. Malara, Esq.
Law Office of Vincent N. Amato
275 North Middletown Road, Suite 1C
Pearl River, NY 10965

Attorneys for Defendant:

Peter J. Gallagher, Esq.
Joshua M. Sivin, Esq.
Johnson Gallagher Magliery LLC
99 Wall Street, 15th Floor
New York, NY 10005