UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
AT&T CORP.,

                Plaintiff,

      – against –

SYNIVERSE TECHNOLOGIES, INC.,

                Defendant.
-----------------------------------------X

                       **OPINION AND ORDER**

                       12 Civ. 1812 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff ("AT&T") and defendant ("Syniverse") are both large telecommunications companies. AT&T brought suit against Syniverse for breach of contract and unjust enrichment, seeking compensatory damages, pre-judgment interest of 12%, and attorney's fees.[1] Last September, we granted partial summary judgment to Syniverse.

    Our findings of fact derive from the testimony and exhibits introduced at trial. For the reasons set forth below, we hold that AT&T is entitled to damages for Syniverse's failure to meet the minimum revenue commitment set out in the parties' 2007 contract. We reserve the calculation of damages and direct the parties to confer and attempt to stipulate to the proper calculation in light of our holdings.

---

[1] Federal jurisdiction is founded on diversity of citizenship. It is uncontested that plaintiff is a New York corporation with its principal place of business in New Jersey, while defendant is a Delaware corporation with its principal place of business in Florida.

## I. <u>BACKGROUND</u>[2]

### A. <u>Parties</u>

AT&T is a subsidiary of one of the world's largest and most famous telecommunications companies. <u>See</u> Egan Aff. ¶ 9. Among other things, it maintains high-speed long-distance networks and sells bandwidth on those networks to other communications firms. Additionally, several companies affiliated with AT&T provide service on local telephone networks.

Syniverse provides services for the mobile telecommunications industry. <u>See</u> Harshbarger Aff. ¶ 1. As relevant to this case, Syniverse provides "SS7 signaling" services that provide information about telephone numbers and calls.

### B. <u>The Dispute at Bar</u>

As described in greater detail below, Syniverse contracted with AT&T for certain telecommunications services, and promised to spend a minimum amount of services during each year of the contract. To the extent that Syniverse failed to meet its

---

[2] In this Memorandum and Order, citations to "___ Aff." are to the direct testimony of the specified witness; citations to "___ Dep." are to deposition transcripts submitted by AT&T; citations to "Tr." are to the trial transcript; citations to "___ Test." are also to the trial transcript, and refer to a particular witness's testimony; citations to "Pl. Ex. ___" are to AT&T's exhibits; citations to "Def. Ex. ___" are to Syniverse's exhibits; and citations to "Summ. J. Order" are to our Memorandum and Order granting partial summary judgment, 2014 WL 4412392, 2014 U.S. Dist. LEXIS 125256, Sept. 8, 2014, ECF No. 44.

annual commitment, Syniverse was required to pay AT&T the shortfall.

AT&T calculated a shortfall following the year from May 2009 to April 2010. Syniverse refused to pay the shortfall, disagreeing with AT&T's calculation in two principal respects. First, AT&T did not include certain services that were provided by AT&T's local affiliates ("switched access services" and "special access services," both described further below). Second, AT&T reduced its revenue calculation by the value of certain credits that AT&T applied against charges on its bills to Syniverse as a result of overcharges in previous years.

### C. Procedural History

On March 12, 2012, AT&T filed a complaint alleging that Syniverse owes AT&T for the difference between Syniverse's contractual commitment and its actual spending during the fourth year of the parties' 2007 contract term. See Compl., ECF No. 1. Syniverse joined issue and, following discovery, moved for summary judgment. See Answer, ECF No. 8; Mot. Summ. J., ECF No. 29. We granted Syniverse's motion in part, requiring AT&T to include in its calculation of Syniverse's spending the value of certain credits and "special access services." See Summ. J. Order, 2014 WL 4412392, at *6–8, 2014 U.S. Dist. LEXIS 125256, at *19–23. However, we found there to be a disputed question whether spending on "switched access

services" should count towards Syniverse's annual commitment. See id., 2014 WL 4412392, at *6, 2014 U.S. Dist. LEXIS 125256, at *18–19.

We held a bench trial on the remaining issues on July 7 and 8, 2015. The parties offered direct testimony by affidavit and witnesses appeared live for further examination. The following witnesses testified on behalf of AT&T:

- Jerry Gilmore is a retired employee of AT&T or AT&T's affiliates who, at the times relevant to this case, managed wholesale long-distance accounts. In that capacity, he supervised the sales group responsible for Syniverse's account, including Kim Reid. He testified as to the parties' negotiations, AT&T's determination that Syniverse had not met its revenue commitment, and the nature of "switched access services."

- Kim Reid is an employee of an AT&T affiliate who, at the times relevant to this case, managed wholesale accounts for AT&T under the direction of Gilmore. She testified as to the parties' business relationship and the nature of "switched access services."

- David J. Egan, an accountant employed by an affiliate of AT&T affiliate, presented AT&T's calculation of damages.

The following witnesses testified on behalf of Syniverse:

- Jackie Lee Harshbarger, Jr., is a Syniverse employee responsible for managing a group that determines what circuits Syniverse requires.  Harshbarger Aff. ¶ 1.  He testified as to Syniverse's performance under its AT&T contracts and the nature of "switched access services."

- Paula Krause, a paralegal for Syniverse's counsel, presented Syniverse's calculation of damages (assuming that AT&T wins on the issue of liability).

- Patrice Kirkpatrick, an employee in Syniverse's accounts payable department, submitted an affidavit to which she attached representative AT&T invoices.  She did not testify in person.

Additionally, we received excerpts from various depositions, including those of the Syniverse employees, Paul Corrao and Dellcenia "Cena" Paxton, who negotiated the AT&T contracts on behalf of Syniverse.

After trial, both parties submitted proposed findings of fact and conclusions of law, ECF Nos. 75-76.

## II. <u>FINDINGS OF FACT</u>

### A. <u>The Telephone Industry</u>

It is well-known that AT&T (then known as the American Telephone and Telegraph Company) once controlled an overwhelming portion of the long-distance and local telephone

service industry in the United States, and that it divested itself of its local affiliates in the early 1980s in response to federal antitrust litigation.  See generally Modification of Final J., United States v. W. Elec. Co., Civ. Action No. 82-0192 (D.D.C. Aug. 24, 1982) (consent decree regarding the restructuring of AT&T and Western Electric); Gilmore Aff. ¶ 7. Under the terms of AT&T's consent decree, telephone service was split between long-distance companies and local companies. AT&T remained in the long-distance business, where it continues to compete against other long-distance providers, such as Sprint and Verizon.  AT&T spun off its local operations over to several successors (the Regional Bell Operating Companies or "Baby Bells"), whose affiliates, along with a few unrelated local carriers, separately provided local telephone service in different regions of the country.

Today, local carriers (called "local exchange carriers" or "LECs") compete to offer local telephone service within local zones (called "local access and transport areas" or "LATAs") while AT&T and its competitors offer long-distance service between LATAs.[3]  Following extensive re-consolidation, many local carriers are now within the same corporate family as long-distance carriers.  Gilmore Aff. ¶ 8.

---

[3] To avoid acronyms, we refer to the LECs as "local carriers" and the LATAs as "local zones" in this opinion.

In particular, AT&T has become part of a corporate structure with several of the Baby Bells.[4]  Gilmore Aff. ¶ 8. AT&T itself provides only long-distance services, while its affiliates provide local services in some local zones.

**B. <u>Syniverse's Usage of Telephone Circuits</u>**

Syniverse provides mobile telecommunications companies with "SS7 signaling" services that provide information about telephone numbers and calls.  Gilmore Aff. ¶ 12.  For example, SS7 signaling assists in connecting and disconnecting phone calls, in providing caller ID information, and in implementing the call-return feature commonly known as *69.  Gilmore Test. 145:19–146:10.

Syniverse does not maintain a physical nationwide network of its own over which to send its signals.  Instead, as is customary in the industry, Syniverse must purchase bandwidth along a physical telephone connection between any two end-points.  Reid Aff. ¶ 7.  To send a signal between end-points in different local zones, Syniverse must purchase two types of circuits: a long-distance circuit between the two local zones, and local circuits from each end-point to the terminus of the long-distance circuit.  Gilmore Aff. ¶ 35.  A dedicated local connection between the end-point and the point of presence is

---

[4] Although the holding company in AT&T's corporate structure is now called "AT&T Inc.," it was in fact one of the Baby Bells that purchased AT&T, rather than the other way around.  Gilmore Aff. ¶ 8.

known as a "special access service." Reid Aff. ¶ 13. Although local carriers provide this service, long-distance carriers may purchase special access service from local carriers and re-sell to customers (such as Syniverse) as part of an integrated local and long-distance circuit. Gilmore Aff. ¶ 35.

Syniverse also purchases "switched access services" from local carriers, although the parties disagree sharply as to what "switched access services" are.[5]

According to AT&T, "switched access service" is "an SS7 type service [that] can send signals into a particular LATA." Reid Aff. ¶ 15. These services are provisioned by a local carrier using a circuit at a "signaling transfer point" administered by the local carrier. Reid Test. 158:19–159:1. According to AT&T, these services (unlike special access) can be purchased only through a local carrier and are not re-sold by long-distance carriers. Gilmore Aff. ¶ 36. Thus, AT&T's local affiliates sold switched access services only through a unified online ordering system, Reid Aff. ¶ 11, and not through sales teams such as the one that Gilmore led. Reid Aff. ¶ 11; Gilmore Test. 141:15–23. (Reid testified, with some

---

[5] AT&T's and Syniverse's contracts, discussed below, do not mention either "special access" or "switched access," nor do they define "Local Channel Services," the contractual term that (according to Syniverse) encompasses both special and switched access. Furthermore, neither party offered an expert to testify that any of the terms have generally-accepted definitions in the industry. It is possible that AT&T's Business Services Guide (referred to in the parties' 2007 contract) defines these services, but neither party introduced the Business Services Guide into evidence.

exasperation in her voice, that she had told Syniverse employees several times that AT&T could not provided Syniverse with switched access services.  Reid Test. 176:1-19.)

According to Harshbarger's affidavit on behalf of Syniverse, "switched access service" is akin to a "lane" on the "highway" of a special access circuit.[6]  Harshbarger Aff. ¶¶ 9, 25; Harshbarger Test. 24:24-25:5, 248:25-249:2.  However, Harshbarger drew a distinction in his oral testimony, not apparent in his affidavit, between "switched access" and "switched services."  Harshbarger Test. 251:7-254:18.  Harshbarger further opined at one point that "switched access" included "everything."  Harshbarger Test. 250:7-9.  Harshbarger also testified that he believed switched access services could be purchased from long-distance carriers as well as local carrier, although he also acknowledged that Syniverse had never bought switched access services from AT&T.  Harshbarger Test. 77:23-25; 238:24-239:2, 239:22-25.

Only one of the many invoices in the record appears to correspond to the services under dispute.  See Def. Ex. 18.[7]  This invoice describes a typical service as follows:

---

[6] More technically, a special access circuit is a "T1" or "DS1" circuit, which consists of multiple lower-speed "DS0" channels.  Harshbarger testified that the DS0 channels within a special access circuit is a switched access circuit.

[7] The invoice offered as defense exhibit 18 was billed to account number 120-165-2504-416, which neither Egan nor Krause took into account in calculating Syniverse's shortfall without switched access services.  See Egan Aff.

```
1 PT8SX    /TRN 0004/TSC AM825079
           /DES CFA 101 T1Z7F 04
           KSCYMO55HI2
           KSCYMO55K04
           INTER 100%
           (      500.00 X      1)
```

No witness explained what this means, and the invoice's "English language glossary" barely helps a lay reader. We can make out from information elsewhere in the invoice that the service code "PT8SX" means "port termination," that both KSCYMO55HI2 and KSCYMO55K04 are physical locations (probably in Kansas City, Missouri), and that "INTER 100%" indicates that 100% of this particular charge fell into an "interstate" service bucket. The invoice also recited that services were provided by "Southwestern Bell Telephone, L.P. d/b/a AT&T Missouri," a local carrier affiliated with AT&T.

Neither AT&T's nor Syniverse's explanation of "switched access services" is entirely satisfactory. It is not clear how AT&T's explanation of switched access services squares with the invoice's description, which appears to refer to an interstate connection between two points. However, Harshbarger's shifting explanations of "switched access" or "switched access service" are even less convincing. It does not make sense that Syniverse would buy switched-access "lanes" in addition to the

---

¶¶ 22-23, 31; Krause Aff. ¶ 2. The other invoices in evidence relate to account numbers that both Egan and Krause included in their calculations. See Long Distance Invoices, Pl. Exs. 20-37, Def. Exs. 57-74; Special Access Invoices, Pl. Exs. 38-73, Def. Exs. 21-56.

private special-access "highways" that those lanes supposedly constitute, especially given that Syniverse has always bought switched access from local carriers while sometimes buying special access from long-distance resellers. And it goes without saying that the parties' precisely drawn contract was not intended to count "everything" towards Syniverse's revenue commitment.

We therefore adopt AT&T's position that switched access service is a usage-based circuit that can be ordered only through local carriers, and that switched access service is utterly distinct from special access service.

## C. Agreements Between the Parties

### 1. Earlier Agreements

Syniverse has contracted with AT&T and its affiliates for telecommunications services since at least 2002. See Am. & Restated AT&T Master Carrier Agreement ("2009 Master Agreement") at 1, Pl. Ex. 2 (referring to a Master Carrier Agreement dated May 9, 2002).

In 2006, the parties executed an agreement for AT&T to provide services similar to those under consideration in the present case. See AT&T Data Service Terms and Pricing Att. ("2006 Attachment"), Pl. Ex. 4. Although the 2006 Attachment does not govern this dispute, we briefly describe its annual revenue commitment provisions, which shed light on

corresponding terms in subsequent contracts.  For the first year, Syniverse committed to purchase $4,700,000 in services; for the second and third years, Syniverse committed to purchase $3,000,000 each year; for the fourth year, Syniverse made no commitment.  <u>See</u> 2006 Att. at ¶ 3(A)(1).  Eligible charges "consist[ed] of the <u>gross</u> Monthly Recurring Charges, prior to the application of any discounts or credits," for certain services, including "Local Channel Services."  2006 Att. at ¶ 3(A)(2) (emphasis added).

### 2. **The 2007 Agreement**

In 2007, the parties resolved a dispute regarding data services by executing a new agreement in October 2007, the 2007 AT&T Data Service Terms and Pricing Attachment ("2007 Attachment"), Pl. Ex. 3.  <u>See</u> Gilmore Aff. ¶¶ 27–28.  This new agreement was to be effective retroactively for a term of four years, from May 2006 to April 2010.[8]  <u>See</u> 2007 Att. at ¶ 2.

In the new 2007 Attachment, the parties once again agreed that Syniverse would commit to purchase a certain amount of services from AT&T each year.  <u>See</u> 2007 Att. at ¶ 3.  For the Year One (which had already passed), Syniverse committed to spend $4,700,000 in eligible services (the same dollar amount as the 2006 Attachment had specified for the same period).  For

---

[8] We refer to the four contract years as Year One, Year Two, Year Three, and Year Four.

the Year Two, Three, and Four, Syniverse committed to spend $3,545,000 in eligible services each year.   Commitment-eligible services consisted of

> the net Monthly Recurring Charges, after the application of any discounts or credits, for Private Line Services, . . . [and] Local Channel Services . . . provided under this Attachment, as well as net charges identified in other Attachments . . . and services provided under other Customer AT&T Data Service Terms and Pricing Attachments as Data MARC [Minimum Annual Revenue Commitment] Eligible Charges for purposes of the Data MARC under this Attachment.

¶ 3(A)(2) (emphasis added).

The 2007 Attachment did not define "Local Channel Services," but provided certain examples: "AT&T Terrestrial 1.544 Mbps [megabits per second] Local Channel," "AT&T *ACCUNET* Generic Digital Access (AGDA) Services," and "Terrestrial 45 Mbps (T45) Local Channel Service."   The contract set monthly and per-mile charges that, at least to some degree, depended on the mileage used.   See ¶¶ 11–12.   The contract apparently contemplated that other Local Channel Services would be priced with reference to the AT&T Business Service Guide, which is not in the record.   Cf. ¶ 11 ("In lieu of the rates and discounts specified in the AT&T Business Service Guide, the following Monthly Recurring Charges apply for the listed services.").

According to his testimony, Gilmore did not consider switched access services to be commitment-eligible.   Gilmore

Test. 258:23-259:4.   This opinion is consistent with other testimony of Gilmore's that Gilmore and Reid's business group was not involved with the sale or billing of switched access. Gilmore Test. 84:8-85:4.   We rely on Gilmore's description of the negotiations both because we find Gilmore's testimony to be credible and because Syniverse did not offer any witnesses (such as Corrao or Paxton) who had been personally involved in the 2007 negotiations.

The parties further agreed on a set of monthly discounts, a package of installation charge waivers, and a one-time credit of $300,000 to be applied in the 21st month of the contract term (i.e., January 2008).   See 2007 Att. at ¶¶ 14-15.   These were the "only" discounts, waivers, and credits to be applied to services provided under the 2007 Attachment.   Id.

In negotiating the new 2007 Attachment's revenue commitments, the parties relied on information about Syniverse's historical annual spending or "run rate."   Gilmore Aff. ¶ 29; Gilmore Test. 136:25-137:5; Paxton Dep. 20:24-24:14; Email from Paxton to AT&T, Pl. Ex. 6.   The parties intended to set Syniverse's annual commitment for Years Two through Four equal to its 2006 run rate plus $200,000 per year.   Gilmore Aff. ¶ 29; Gilmore Test. 136:25-137:5; Email from Paxton to

AT&T, Pl. Ex. 6.[9]  According to Gilmore's testimony, which we credit,[10] Gilmore accidentally included Syniverse's 2006 spending on special access services (but not switched access services) in the 2006 run rate.  Gilmore Aff. ¶ 29.

### 3. __The 2009 Agreements__

In 2009, the parties superseded their 2007 agreement with respect to certain services by signing the 2009 AT&T Data Service Terms and Pricing Attachment ("2009 Attachment"), Pl. Ex. 10.  This new agreement set forth new pricing and other terms for Private Line Services, Access Channel Services, International Satellite Services, and Frame Relay Service, but not for Local Channel Services or other services covered by the 2007 Attachment.  See 2009 Att. at ¶ 1.  This agreement also provided a minimum _monthly_ revenue commitment of $0 in net charges per month for services provided under the 2009 Attachment.  See 2009 Att. at ¶ 3.

---

[9] AT&T highlights that Paxton wrote, "[W]e would exclude all pass through spend or any related to SBC which we made."  AT&T argues that "pass through spend" referred to amounts that Syniverse spent with AT&T's affiliates.  Equally plausible, though, is Paxton's own explanation that "pass through spend" referred to amounts that Syniverse paid to AT&T on behalf of Syniverse's customers.  See Paxton Dep. 23:7-17.  Neither the rest of Paxton's email nor Paxton's deposition supplies sufficient context for us to adopt AT&T's theory.

[10] We find Gilmore to be a credible witness.  He generally appeared to be candid, and he openly admitted his own errors in 2006-2009 regarding the treatment of Special Access Services and other details in the calculation of Syniverse's spending.  Furthermore, he was plainly knowledgeable concerning the technical subject matter of his testimony from years of working for AT&T and other telecommunications companies.  By contrast, Syniverse did not present any witness, such as Corrao and Paxton, with personal knowledge of the 2007 negotiations.

At the same time that the parties executed the 2009 Attachment, they also executed the 2009 Master Agreement, which listed both the 2007 Attachment and the 2009 Attachment in its Table of Documents.   The 2009 Master Agreement recited that "[t]his Agreement consists of . . . the documents listed in the Table of Documents . . . ."  2009 Master Agreement at page 1 of cover sheet.

### 4.  Provisions Concerning Interest and Legal Fees

In 2007, the parties agreed to a Supplemental Terms and Conditions Attachment that included the following terms:[11]

> 1. Section 3 [of the General Terms and Conditions] is deleted in its entirety and replaced with the following:
>
> **3S.  _Non-Payment._**  AT&T may add interest charges to any past due <u>undisputed</u> amounts at the lower of 12.0% per year or the maximum rate allowed by law.  [Syniverse] shall reimburse AT&T for reasonable attorney's fees and any other costs associated with collecting delinquent or dishonored payments. . . .

Pl. Ex. 15 (emphasis added).

---

[11] The 2009 Master Agreement included a somewhat broader provision that "AT&T may add interest charges to <u>any past due amounts</u>" at 1.5% per month.  Pl. Ex. 2 at § 3 (emphasis added).   However, the same Master Agreement also incorporated the 2007 Supplemental Terms, <u>see</u> Pl. Ex. 2, Table of Docs., and AT&T appears to concede that the Supplemental Terms' customized interest provision remained in force.   <u>See</u> Egan Aff. ¶ 36 (quoting Supplemental Terms).

D. **The Parties' Course of Performance**

   1. **Year One**

Year One (May 2006 to April 2007) was over before the parties executed the 2007 Attachment.   Although the 2007 Attachment nominally applied a $4.7-million revenue commitment retroactively to Year One, it is undisputed that Syniverse did not come close to spending $4.7 million on the services that AT&T accepts as eligible.   A spreadsheet attached to Harshbarger's affidavit appears to show that Syniverse spent approximately $3.44 million on such services in Year One and an additional $1.01 million on switched access services that AT&T asserts do not contribute to Syniverse's commitment.   See Def. Ex. 12 at 1.[12]   (Gilmore testified to his recollection that Syniverse spent approximately $5 million on switched access services in 2006.   Gilmore Aff. ¶ 31.   Unlike most of Gilmore's testimony, this particular recollection is not credible because

---

[12] This spreadsheet and similar ones submitted by Syniverse (see Def. Exs. 13-14) are confusing in that they break up Syniverse's spending into categories called "Contract '8' Accounts," "Local Channel Services," "Local Channel Services (Ports)," and "Data Transactions" that do not obviously correspond to the categories we have dealt with in this case.   We interpret "Contract '8' Accounts" to mean services ordered through accounts associated with the 2007 Attachment (which are indisputably eligible), "Local Channel Services" to mean special access services ordered through local carrier affiliates (which, for purposes of this trial, AT&T acknowledges are eligible), and "Local Channel Services (Ports)" to mean the switched access services that are in dispute.   We need not determine (and do not pretend to know) what "Data Transactions" are because Syniverse did not spend anything in this category.   Our interpretation of Syniverse's spreadsheet is based on AT&T's interpretation (see Pl. Ex. 17), Harshbarger's quotation of an amount spent on switched access circuits that corresponds to the data in the exhibit's "Local Channel Services (Ports)" row (see Harshbarger Aff. n.2), and defense counsel's description of Exhibit 12 (see Tr. 39-40).

it is not supported by data and is not close to Syniverse's later spending levels.  Accordingly, we accept that Syniverse's raw data for Year One are roughly accurate.)

The parties offer different explanations for the 2007 Attachment's inclusion of a retroactive revenue commitment that Syniverse had already failed to meet.  Syniverse argues that switched access services must have been intended as eligible (and that certain credits were also intended as eligible), so that Syniverse's commitment-eligible spending in Year One exceeded $4.7 million.  AT&T argues that the parties simply carried over the $4.7 million figure from the 2006 Attachment without bothering to consider whether Syniverse attained its commitment under the new "net" calculation.

Altogether, we find AT&T's explanation more likely for three main reasons.  First, the $4.7 million figure in the 2007 Attachment is precisely equal to the corresponding figure in the 2006 Attachment.  Second, the email correspondence between AT&T and Syniverse leading up to the 2007 Attachment does not discuss the Year One commitment at all.  Instead, the discussion focuses on how to calculate what eventually became the commitment level for Years Two through Four.  See, e.g., Pl. Ex. 5 (Cena Paxton: "The[] way I understand the proposal . . . is that we agree to take our spend number for 2006[,] multiply by 3 and then add the $600K."). Third, Gilmore

testified credibly that he did not go back and calculate Syniverse's attainment for Year One because Year One had already passed.  Gilmore Aff. ¶ 28.

Syniverse's theory has two main problems.  First, Syniverse relies heavily on the fact that the 2006 Attachment's commitment referred to <u>gross</u> spending while the 2007 Attachment's commitment referred to <u>net</u> spending.  This observation, if anything, bolsters AT&T's view that the parties simply carried over the $4.7 million figure from the 2006 Attachment without focusing on whether the 2006 Attachment's level was appropriate to include in the 2007 Attachment.  Second, Syniverse's theory does not resolve the supposed absurdity.  Even counting the services that Syniverse believes to be eligible, it appears that Syniverse failed to spend $4.7 million in Year One.  <u>See</u> Def. Ex. 12.

AT&T did not charge Syniverse for the shortfall, even though Syniverse did not (at least in AT&T's view) reach its revenue commitment in Year One.  This is consistent with Gilmore's explanation that he never calculated Syniverse's attainment for a year that, by late 2007, had already passed.

## 2. <u>Years Two and Three</u>

Excluding switched access services from the calculation, Syniverse spent less than its minimum annual commitment of $3.545 million in both Year Two and Year Three.  Including

switched access services, Syniverse spent more than its commitment. See Def. Exs. 13-14; Pl. Ex. 7.[13] Nevertheless, AT&T did not report a shortfall (or indeed any calculation of Syniverse's annual spending) to Syniverse and has not sought to collect on the shortfall.[14] Gilmore Aff. ¶ 22; Harshbarger Aff. ¶ 21.

Gilmore offered a plausible explanation for why he did not report a shortfall to Syniverse in Years Two and Three. According to him, he made two errors when he initially calculated Syniverse's spending in Years Two and Three. See Gilmore Test. 107:25-108:1, 110:6. First, Gilmore mistakenly included special access spending in his calculations. Gilmore Test. 109:16-19. Second, Gilmore double-counted approximately $360,000 per year in "frame relay service"——once as its own category, and again within the more general "data" category.[15] See Gilmore Test. 111:7-18, 118:2-7.

_____

[13] Our understanding of plaintiff's exhibit is that the "TOTAL" column indicates Syniverse's spending through accounts associated with AT&T, and that "LOCAL DATA" indicates Syniverse's spending on special access service through accounts associated with AT&T affiliates. Thus, the two columns together represent Syniverse's spending without switched access service.
   We do not rely on any of these exhibits to be precisely accurate. Both exhibits are explained poorly, and plaintiff's exhibit (along with the similar Exhibit 16) has been substantially corrected with respect to Year Four. See Pl. Ex. 92.
[14] AT&T may not bill Syniverse for charges more than 120 days after the charges are incurred. See Supp. Terms & Conditions, Pl. Ex. 15 ¶ 5.
[15] Gilmore did not preserve his original or corrected calculations, and the parties have not presented intelligible reconstructions. Nevertheless, we find Gilmore's detailed and forthright testimony of his own errors to be credible. Gilmore's explanation is at least plausible, given that

### 3. Year Four

In mid-2009 (i.e., near the beginning of Year Four), Harshbarger participated in an effort to reduce Syniverse's spending on leased circuits. Harshbarger Aff. ¶ 17; Harshbarger Test. 228:15-229:16. Syniverse requested bids on certain services, and Gilmore became aware of Syniverse's bid requests by August 3, 2009, at the latest. Harshbarger Aff. ¶ 17; Gilmore Test. 121:2-4. At the time, Gilmore viewed Syniverse's bids as an opportunity for AT&T to earn more business, although Syniverse ultimately chose to move circuits away from AT&T, see Gilmore Test. 121:11-13; Email from Gilmore to John Wick, Aug. 24, 2009, Pl. Ex. 8 ("Our current effort should address [Syniverse's projected revenue shortfall]."); Harshbarger Aff. ¶ 17.

In July 2009, Syniverse's spending with AT&T dropped "appreciably." Gilmore Test. 107:14-16; see also Gilmore Test. 123:14-20. This decline, combined with inquiries about the revenue commitment from Syniverse manager John Wick, provoked Gilmore to examine Syniverse's revenue more closely.[16] Gilmore

---

Syniverse's spending (including special access services) came within $500,000 of its commitment. Harshbarger Aff. ¶ 23.

[16] Syniverse maintains that its spending did not decrease materially during Year Four. See Harshbarger Aff. ¶¶ 19-20. It is difficult to determine whether Gilmore's or Harshbarger's recollection is accurate on this point, as neither party presented a well-organized summary of Syniverse's spending over the four years. Regardless, it is clear that something provoked Gilmore to probe into Syniverse's spending, and there is nothing

Test. 106:17-22, 107:16-18.  According to Gilmore, his "full reconciliation" revealed the two errors in his earlier calculations of Syniverse's spending.

Later in August 2009, Gilmore informed Wick that Syniverse was on track for a shortfall of approximately $295,000 in Year Four (May 2009 to April 2010).  Gilmore Test. 114:22-23, 124:14-17; Email from Gilmore to Wick, Pl. Ex. 8.  Wick's reaction was to say, in essence, "It sounds like we need some more data."  Gilmore Test. 137:19-22.  Syniverse, however, did not increase its data usage sufficiently to meet its revenue commitment according to Gilmore's methodology.  Instead, Syniverse spent only approximately $2.5 million on services that Gilmore considered to be commitment-eligible and approximately $600,000 on special access services.[17]  See Egan Aff. ¶¶ 32-34, Def. Exs. 75-76.  The amount that Syniverse spent on AT&T affiliates' switched access services is not in the record, but AT&T appears to concede that Syniverse's switched access spending was sufficient to bridge the gap between Syniverse's other spending and its revenue commitment.

---

illegitimate about an account manager's attempt to better understand his customer's spending patterns.

[17] The parties' calculations are very close to each other.  The main difference is that AT&T deducted the value of certain credits that were grouped into a "One-Time Charges/Credits" bucket on AT&T's invoices even though these credits offset charges in the "Monthly Charges" bucket that Syniverse included in its calculation.  See, e.g., Pl. Ex. 92 (chart showing discrepancies); July 2009 Invoice at 7, Def. Ex. 57 (invoice for account number 8001-188-0269 showing service assurance warranty credit as a one-time credit offsetting monthly circuit charge).

Based on Gilmore's optimism about Syniverse's bidding process, Wick's response to Gilmore's email about the projected shortfall, and Reid's testimony that she wished to cultivate a long-term relationship with Syniverse (see Reid Test. 177:13–19), we reject Syniverse's suggestion that AT&T concocted a shortfall in order to pressure Syniverse into buying more services in the short-term.

At the end of Year Four, AT&T billed Syniverse for a shortfall of $1,407,624 plus unspecified taxes and regulatory fees.  Invoice, Pl. Ex. 9.  Syniverse refused to pay the billed shortfall and contested the charge through AT&T's internal dispute resolution protocol.  Egan Test. 195:16–19.  AT&T denied Syniverse's dispute, and has continued to bill Syniverse for the shortfall.  Meanwhile, Syniverse has paid new charges but not the shortfall.  See Pl. Ex. 91.

## III. <u>CONCLUSIONS OF LAW</u>

### A. <u>The 2007 Attachment's Revenue Commitment Was Still in Effect During Year Four.</u>

Contrary to Syniverse's contention, the 2009 Attachment did not displace the 2007 Attachment's minimum annual revenue commitment.  First, the 2009 Master Agreement, by listing the 2007 Attachment in its list of documents, indicated that the 2007 Attachment remained in effect to the extent that it was not inconsistent with the later 2009 Attachment.  Second, as we

noted in our summary judgment opinion, "there is nothing inherently contradictory about having a minimum annual revenue commitment of $3,545,000 and a minimum monthly revenue commitment of $0.  Such an arrangement would merely require Syniverse to order at least $3,545,000 worth of services during the year while allowing it total flexibility on when it could order those services."  Summ. J. Order, 2014 WL 4412392, at *5, 2014 U.S. Dist. LEXIS 125256, at *16.  Third, the 2007 Attachment covered a broader set of products than the 2009 Attachment, so the 2007 Attachment's minimum revenue commitment provision was compatible with a lower revenue commitment on the 2009 Attachment's narrower set of products.  Fourth, Syniverse has not provided evidence that the parties, in negotiating the 2009 Attachment, intended to cancel Syniverse's revenue commitment, which had been the basis for AT&T to provide Syniverse with discounted rates.  Thus, we conclude that Syniverse was obligated to spend $3,545,000 in revenue covered by the 2007 Attachment during Year Four.

### B.  Syniverse Fell Short of Its Revenue Commitment in Year Four.

#### 1. Local Channel Services

We conclude for several reasons that switched access services provided by AT&T affiliates are not "Local Channel Services" under the 2007 Attachment.

First, the contract does not explicitly define "Local Channel Services" or include sufficient context to define "Local Channel Services" implicitly.  Hence, we must consider extrinsic evidence.

Second, we credit Gilmore's testimony that he never considered switched access services to be "Local Channel Services."  On this basis, he did not include switched access services as part of the "run rate" calculation that AT&T and Syniverse used as the basis for the 2007 Attachment's annual revenue commitment.  This distinguishes switched access from special access services, which were included in the run rate, regardless of whether sold by local carriers or re-sold by AT&T.

Third, even if switched access services are "local channel services" in the sense of being "services" on a "local channel," the switched access services under dispute in this case were simply not provided by AT&T.  Unlike special access services, switched access services were never re-sold by AT&T and could not be ordered through AT&T's long-distance office.  That AT&T's customer service agents sometimes assisted Syniverse in resolving problems related to AT&T affiliates' products (see Reid Aff. ¶ 10; Harshbarger Aff. ¶ 22; Reid Test. 179:18-24) does not alter the conclusion that the local carrier affiliates——and not AT&T itself——provided switched access

services.   A  major  customer  of  a  large  enterprise  will reasonably  expect  its  relationship  manager  to  help  with products  across  the  entire  enterprise  without  regard  to corporate formalities.

### 2. **Equitable Estoppel**

Syniverse  argues  alternatively  that  AT&T  should  be equitably estopped from excluding switched access services from AT&T's  revenue  calculation.   See  Summ.  J.  Order,  2014  WL 4412392,  at  *7,  2014  U.S.  Dist.  LEXIS  125256,  at  *22–23 (applying  equitable  estoppel  to  special  access  services).   The gist of this argument is that Syniverse could have obtained the same switched access services in a commitment-eligible way (or perhaps could have increased its spending on other products), if  AT&T  had  not  led  Syniverse  to  believe  that  Syniverse's switched  access  services  would  be  commitment-eligible.   For example,  in  the  context  of  special  access  services,  AT&T included special access services in its run rate during the 2007 negotiations, causing Syniverse to expect that special access services would be commitment-eligible.  If Syniverse had known that AT&T did not consider special access services to be commitment-eligible  when  purchased  through  local  affiliates, then Syniverse could have purchased the same services through AT&T instead of through AT&T's local affiliates.

This argument fails for two reasons.  First, AT&T did not lead Syniverse to believe that Syniverse's switched access services would be commitment-eligible, as AT&T did not include switched access services in the run rate that AT&T provided to Syniverse as the basis for the 2007 Attachment.  Second, once AT&T projected a shortfall in 2009 (again excluding switched access services), Syniverse did not attempt to move its switched-access spending to commitment-eligible accounts or otherwise act to increase its spending on commitment-eligible services.

### 3. **Syniverse's "Immaterial Breach" Theory**

Syniverse argues that Syniverse could have ordered switched access services through Syniverse's commitment-eligible AT&T accounts instead of through AT&T's local affiliates.  Thus, according to Syniverse, the shortfall really pertains to the "immaterial breach" of ordering through the "wrong" entity.  This theory contradicts our factual conclusion that Syniverse could only order switched access services through the affiliates.  Syniverse's error was not that it ordered switched access services the wrong way, but that it spent money on services that could not have come within the scope of the 2007 Attachment.

### 4. **Conclusion**

Without including switched access services, Syniverse spent approximately $2,500,000 on services billed through AT&T and approximately $600,000 on special access services billed through AT&T's local affiliates. See Egan Aff. ¶ 34; Def Exs. 75-76. This places Syniverse's shortfall between $400,000 and $500,000.

**C. Syniverse's Spending Should Be Counted Net of Credits.**

Throughout Year Four, AT&T applied miscellaneous (relatively small) credits to certain charges in Syniverse's bills. We conclude that these credits should be deducted from the gross billing amount when comparing Syniverse's spending to its revenue commitment. This conclusion follows from the text of the 2007 Attachment, which sets out a commitment for net rather than gross spending. This conclusion is also consistent with Egan's unrebutted testimony that AT&T "generally transitioned to net calculations in the mid-2000's . . . because the net calculations more easily correlate to the actual charges to a customer as shown on AT&T's invoices." Egan Aff. ¶ 14.

Syniverse maintains that its billing credits should be disregarded because the 2007 Attachment permitted only a single credit of $600,000 in month 21 of the agreement. It is correct that 2007 Attachment itself did not contemplate any credits beyond the $600,000 lump sum in month 21. However, the 2007

Attachment did not bar AT&T from offering further credits, and the 2007 Attachment's "net" calculation is not limited to credits that AT&T was required to offer by the 2007 Attachment.

Syniverse also argues that our Summary Judgment Order disposed of this question in Syniverse's favor. This is not correct. Syniverse's summary judgment motion, and hence our decision, pertained only to AT&T's practice of crediting Syniverse for overpayments during previous months. See Def.'s Mem. of Law in Supp. of Mot. Summ. J. at 15 n.4, ECF No. 31. In this situation, the credit does not alter the value of services that Syniverse purchased during the period under consideration; the credit indicates that Syniverse effectively paid too soon. Therefore, the credit should not be taken into account when calculating Syniverse's revenue attainment. Syniverse's spending calculation should be based on the amount that was properly billed for services on each month's bill.

By contrast, Syniverse receives a credit for service interruption (for example), it means that Syniverse has actually received and paid for less service than otherwise. This is not an issue of payment timing.  In this context, Syniverse's spending should be measured as the net spending on services rendered, net of the service interruption credit.

D. **AT&T May Not Recover Taxes and Regulatory Fees.**

In 2010, AT&T included a considerable amount of taxes and regulatory fees in its bill for Syniverse's shortfall. See Monthly Invoice at p. 4 item no. 000005, Pl. Ex. 9Q. AT&T has disclaimed any intention to recover taxes and fees on the shortfall amount and has not submitted evidence of such taxes and fees. See Tr. 186:12-187:7. Accordingly, AT&T may not recover any such taxes or fees.

E. **AT&T May Not Recover Pre-Judgment Interest at 12%.**

The Supplemental Terms which AT&T and Syniverse specially bargained for, provide that pre-judgment interest is charged at 12% only for underlined undisputed past-due payments. AT&T suggested at trial that the word "undisputed" refers specifically to payments that are subject to AT&T's internal mechanism for resolving customer disputes. To the contrary, the unqualified word "undisputed" connotes any kind of good-faith dispute, including good-faith litigation.

The present litigation proceeded in good faith. Syniverse prevailed in part at summary judgment and presented colorable arguments on the remaining issues at trial. In this context, AT&T may not apply 12% interest to Syniverse's shortfall. Instead, New York's standard 9% pre-judgment interest provisions apply to the shortfall. See N.Y. C.P.L.R. 5001 (Consol. 2008).

**F. AT&T May Not Recover Attorney Fees.**

The Supplemental Terms provide that AT&T may recover reasonable attorney fees for "delinquent" payments.  Supp. Terms & Conditions Att., Pl. Ex. 15.  Although "delinquent" can simply mean "past due" (see, e.g., Delinquent (adj. 3), Black's Law Dictionary (10th ed. 2014) ("past due or unperformed")), it appears in this context to mean a payment that is seriously past-due without cause.  We reach this interpretation for several reasons.

First, the Supplemental Terms use both "past due" and "delinquent" in fairly close proximity, suggesting that they mean different things.  "Delinquent" tends to connote bad faith or irresponsibility to a greater extent than "past due," and so we conclude that "delinquent" distinctively indicates an unexcused failure to pay.

Second, the word "delinquent" is used in the context of collections and "dishonored" payments, suggesting that "delinquent" payments are payments that, like a dishonored check, can be collected without serious litigation on the merits.

Third, New York law allows fee-shifting only when "'the intention to do so is unmistakably clear' from the language of the contract."  Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003) (quoting Hooper Assocs., Ltd. v. AGS

31

Computers, Inc., 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905 (1989)). The Supplemental Terms, at the very least, do not "unmistakably" provide for AT&T to receive attorney's fees on account of Syniverse's partially successful, good-faith effort to challenge AT&T's invoices in court.

**IV. <u>CONCLUSION</u>**

Switched access services provided by AT&T's local carrier affiliates did not contribute towards Syniverse's minimum revenue commitment during Year Four of the parties' contract. For Year Four of its contract with AT&T, Syniverse owes the difference between its annual revenue commitment under the 2007 Attachment and its spending, exclusive of switched access services provided by AT&T's local affiliates.

Accordingly, the parties shall confer and attempt to stipulate to damages consistent with this Memorandum. The parties should bear in mind that AT&T may not recover taxes or fees on the shortfall, that AT&T may recover only statutory pre-judgment interest of 9%, that AT&T may not recover for recently billed charges that are not yet past due (<u>see</u> Tr. 199:18-200:4), and that Syniverse's spending should be calculated net of credits (except for the specific credits considered in our order on summary judgment). If the parties cannot stipulate to damages, then they shall each submit a

proposed judgment by October 9, 2015, with each party allowed a response by October 16.

**IT IS SO ORDERED.**

Dated:     New York, New York
           September __9__, 2015

                                   _Naomi Reice Buchwald_
                                   NAOMI REICE BUCHWALD
                                   UNITED STATES DISTRICT JUDGE